### PETER ANDERSON v. UNITED REALTY CO. ET AL.

1. AN UNRECORDED DEED DOES NOT EFFECT A PURCHASER AT JUDICIAL SALE.

A deed of lands executed by a mortgagor thereof in 1843, not filed for record within six months of its execution, nor until after decree and sale of such lands in a suit to foreclose the mortgage, wherein the mortgagor was a defendant, to a *bona fide* purchaser without knowledge of such deed, is ineffective against the title so acquired at such judicial sale.

[For other cases in point, see 2 Cyc. Dig., "Bona Fide Purchaser," §§ 256-267; 5 Cyc. Dig., "Judicial Sales," §§ 144-172.—Ed.]

2. RELEASE OF TITLE BY PRIOR MORTGAGEE.

The same results would follow if the purchaser at such judicial sale had knowledge of such prior deed, but, before the judicial sale to him was consummated by deed, the grantee in such prior deed, for a valuable consideration, agreed to not stand. upon the title thereby acquired, and to allow the title under the judicial sale to prevail.

3. LONG PAST TRANSACTIONS LIGHTLY DISTURBED.

The repose of titles founded on long past transactions, the full and exact evidence whereof may have disappeared, should not be lightly disturbed, especially where there has been long undisturbed possession thereunder, and valuable improvements have been made on the faith thereof.

4. DEED TAKES EFFECT FROM TIME OF DELIVERY.

A deed executed by trustees and delivered in escrow, in the exercise of power to convey, to be delivered by the depositary to the grantee upon the performance by him of certain conditions, and accordingly delivered. to the grantee though after. the cessation of the power of the trustees, takes effect by relation and conveys the title as of the date of the first delivery.

[For other cases in point, see 3 Cyc. Dig., "Deeds," §§ 401-405.—Ed.]

5. PROVISIONS OF WILL DEVISING WITH LIMITATION OVER PASSES A DEFEASIBLE FEE.

A devise by terms describing a fee simple, or from which a purpose to devise a fee simple is inferable, followed by a limitation over in the event that the devisee shall die "without issue," or "without children," or "without descendants," or "without heir of his body," or "without legitimate heirs," or the like, such limitation over is on a definite failure of issue surviving the aforesaid devisee at the time of his death; and in such case no estate is limited to such "issue" or "heir of the body," or the like, but the provision simply declares the condition or contingency upon which the limitation over shall take effect. It qualifies the fee first devised, making it, instead of an unconditional fee simple, as it would otherwise be, a conditional or defeasible fee.

[For other cases in point, see 7 Cyc. Dig., "Wills," §§ 723-856.—Ed.]

Lucas County.

6. INTENTION OF TESTATOR TO GOVERN THE CONSTRUCTION OF WILL.

> In construing a will all arbitrary rules of construction must give way to the primary rule that the manifest intention of the testator must be given effect.
>
> [For other cases in point, see 7 Cyc. Dig., "Wills," §§ 444-469.—Ed.]
>
> [Syllabus by the court.]

ERROR to Lucas common pleas court.

**C. A. Thatcher, R. P. Carey** and **C. H. Trimble,** for plaintiff in error:

Upon jurisdiction of state court after petition for removal is filed. *American Bridge Co.* v. *Hunt,* 14 O. F. D. 713 [130 Fed. Rep. 302; 64 C. C. A. 548]; *Mansfield, C. & L. M. Ry.* v. *Swan,* 5 O. F. D. 290 [111 U. S. 379; 4 Sup. Ct. Rep. 510; 28 L. Ed. 462]; *Madisonville Trac. Co.* v. *Mining Co.* 196 U. S. 239 [25 Sup. Ct. Rep. 251; 49 L. Ed. 462]; *Louisville & N. Ry.* v. *Wangelin,* 132 U. S. 599 [10 Sup. Ct. Rep. 203; 33 L. Ed. 474]; *Chesapeake & O. Ry.* v. *Dixon,* 179 U. S. 131 [21 Sup. Ct. Rep. 67; 45 L. Ed. 121]; *Crehore* v. *Railway,* 131 U. S. 240 [9 Sup. Ct. Rep. 692; 33 L. Ed. 144]; *Kansas City, Ft. S. & M. Ry.* v. *Daughtry,* 138 U. S. 298 [11 Sup. Ct. Rep. 306; 34 L. Ed. 963]; *Carson* v. *Dunham,* 121 U. S. 421 [7 Sup. Ct. Rep. 1030; 30 L. Ed. 992]; *Barney* v. *Latham,* 103 U. S. 205 [26 L. Ed. 514]; *Brooks* v. *Clark,* 119 U. S. 502 [7 Sup. Ct. Rep. 301; 30 L. Ed. 482]; *Connell* v. *Smiley,* 156 U. S. 335 [15 Sup. Ct. Rep. 353; 39 L. Ed. 443]; 18 Enc. Pl. & Prac. 232; *Hoge* v. *Insurance Office,* 103 Fed. Rep. 513; *Sharkey* v. *Mill Co.* 92 Fed. Rep. 425; *Insurance Co. of N. A.* v. *Insurance Co.* 50 Fed. Rep. 257; *Le Mars* v. *Railway,* 48 Fed. Rep. 661; *Dred Scott* v. *Sanford,* 60 U. S. (19 How.) 393 [15 L. Ed. 691]; *Remington* v. *Railway,* 198 U. S. 95 [25 Sup. Ct. Rep. 577; 49 L. Ed. 959]; *Stone* v. *South Carolina,* 117 U. S. 430 [6 Sup. Ct. Rep. 799; 29 L. Ed. 962]; *Ashe* v. *Insurance Co.* 115 Fed. Rep. 234; *Baltimore & O. Ry.* v. *Koontz,* 104 U. S. 5 [26 L. Ed. 643]; *Home L. Ins. Co.* v. *Dunn,* 4 O. F. D. 329 [86 U. S. (19 Wall.) 214; 22 L. Ed. 68; *Oakley* v. *Goodnow,* 118 U. S. 43 [6 Sup. Ct. Rep. 944; 30 L. Ed. 61]; *Meyer* v. *Railway,* 100 U. S. 457 [25 L. Ed. 593]; *Monnett* v. *Railway,* 26 O. C. C. 469; *Atlantic & G. W. Ry.* v. *Stringer,* 32 Ohio St. 468; *Shelby* v. *Hoffman,* 7 Ohio St. 450; *State* v. *Fairfield Co. Com. Pl.* 15 Ohio St. 377; *Hadley* v. *Dunlap,* 10 Ohio St. 1; *Central Passenger Assur. Co.* v. *Pierce,* 27 Ohio St. 155; *Telluride Power Transmission Co.* v. *Railway,* 187 U. S. 569 [23 Sup. Ct. Rep. 178; 47 L. Ed. 307]; *Missouri Pac. Ry.* v. *Fitzgerald,* 160 U. S. 556 [16 Sup. Ct. Rep. 389; 40 L. Ed. 536]; *Lawton* v. *Blitch,* 30 Fed. Rep. 641; 18 Enc. Pl. & Prac. 350; *Wabash Western Ry.* v. *Brow,* 164 U. S. 271 [17 Sup. Ct.

Anderson v. Realty Co.

Rep. 126; 41 L. Ed. 431]; *Pennsylvania Co.* v. *Bender,* 7 O. F. D. 505 [148 U. S. 255; 13 Sup. Ct. Rep. 591; 37 L. Ed. 441]; *Marshall* v. *Holmes,* 141 U. S. 589 [12 Sup. Ct. Rep. 62; 35 L. Ed. 870]; *Manning* v. *Amy,* 140 U. S. 137 [11 Sup. Ct. Rep. 707; 35 L. Ed. 386]; *Burlington, C. R. & N. Ry.* v. *Dunn,* 122 U. S. 513 [7 Sup. Ct. Rep. 1262; 30 L. Ed. 1159]; *St.. Paul & C. Ry.* v. *McLean,* 108 U. S. 212 [2 Sup. Ct. Rep. 498; 27 L. Ed. 703]; *National Steamship Co.* v. *Tugman,* 106 U. S. 118 [1 Sup. Ct. Rep. 58; 27 L. Ed. 87]; *Turner* v. *Loan & Tr. Co.* 106 U. S. 552 [1 Sup. Ct. Rep. 519; 27 L. Ed. 273]; *Pittsburg, C. & St. L. Ry.* v. *Ramsey,* 89 U. S. (22 Wall.) 322 [22 L. Ed. 823]; *Monroe* v. *Williamson,* 81 Fed. Rep. 977; *Wills* v. *Railway,* 8 O. F. D. 385 [65 Fed. Rep. 532]; *Merriamn* v. *Dunbar,* 11 Neb. 208 [7 N. W. Rep. 443]; *Birdseye* v. *Shaeffer,* 37 Fed. Rep. 821; *Kern* v. *Huidekoper,* 103 U. S. 485 [26 L. Ed. 354]; *Home L. Ins. Co.* v. *Dunn,* 4 O. F. D. 329 [86 U. S. (19 Wall.) 214 [22 L. Ed. 68]; *Wadleigh* v. *Insurance Co.* 76 Wis. 439 [45 N. W. Rep. 109]; *Farmers Loan & Tr. Co.* v. *Railway,* 9 Biss. 133 [8 Fed. Cas. 1043]; *Shepherd* v. *Bradstreet Co.* 65 Fed. Rep. 142; *Mahoning Min. Co.* v. *Bennett,* 4 Sawy. 289, 291 [16 Fed. Cas. 495]; *Chambers* v. *Railway,* 104 Iowa 238 [73 N. W. Rep. 593]; *Gordon* v. *Longest,* 41 U. S. (16 Pet.) 97 [10 L. Ed. 900]; *Virginia* v. *Rives,* 100 U. S. 313 [25 L. Ed. 667]; *Walker* v. *Collins,* 167 U. S. 57 [17 Sup. Ct. Rep. 738; 42 L. Ed. 76]; *First Nat. Bank* v. *Prager,* 91 Fed. Rep. 689 [34 C. C. A. 51; 63 U. S. App. 703]; *New Orleans, M. & T. Ry.* v. *Mississippi,* 102 U. S. 135 [26 L. Ed. 96].

Title to property in question. *Wilson* v. *Johnson,* 74 Wis. 337 [43 N. W. Rep. 148]; 22 Am. & Eng. Enc. Law (2 ed.) 892; *Lord* v. *Hartford,* 175 Mass. 320 [56 N. E. Rep. 609]; *Learned* v. *Foster,* 117 Mass. 365; 2 Jones, Mortgages 1881; *Edmondson* v. *Welsh,* 27 Ala. 578; *Hayward* v. *Bank,* 96 U. S. 611 [24 L. Ed. 855]; *Easton* v. *Bank,* 24 Fed. Rep. 523; *Kelly* v. *Matlock,* 85 Cal. 122 [24 Pac. Rep. 642]; *Hill* v. *Finigan,* 77 Cal. 267 [19 Pac. Rep. 494; 11 Am. St. Rep. 279]; *Ward* v. *Ward,* 108 Ala. 278 [19 So. Rep. 354]; *Sharpe* v. *Bank,* 87 Ala. 644 [7 So. Rep. 106]; *Ramsey* v. *Merriam,* 6 Minn. 168; *Morris* v. *Daniels,* 35 Ohio St. 406; *Shank* v. *Dewitt,* 44 Ohio St. 237 [6 N. E. Rep. 255]; *McGuffey* v. *Finley,* 20 Ohio 474; *Carter* v. *Walker,* 2 Ohio St. 339; *Scribner* v. *Lockwood,* 9 Ohio 184.

Interpretation of the will. *James* v. *Pruden,* 14 Ohio St. 251; Schouler, Wills 470; 3 Jarman, Wills 704; Beach, Wills Sec. 308; *Taylor* v. *Bell,* 158 Pa. St. 651 [28 Atl. Rep.. 208; 38 Am. St. Rep. 857]; *Cox* v. *Sims,* 125 Pa. St. 522 [17 Atl. Rep. 465]; *Giles* v. *Little,* 104 U.

Lucas ·County.

S. 291 [26 L. Ed. 745]; *Green·* v. *Hewitt,* 97 Ill. 113 [37 Am. Rep. 102];
2 Werner, Administration Sec. 343; 4 Am. Prob. Rep. 274; *Freeman*
v. *Coit,* 96 N. Y. 63; *Foote* v. *Sanders,* 72 Mo. 616; *Smith* v. *Bell,* 31
U. S. (6 Pet.) 68 [8 L. Ed. 322]; *Shaw* v. *Hoard,* 18 Ohio St. 227;
*Widows' Home* v. *Lippardt,* 70 Ohio St. 261 [71 N. E. Rep. 770];
*Stuart* v. *Walker,* 72 Me. 145 [39 Am. Rep. 311]; 1 Washburn, Real
Prop. (6 ed.) Sec. 192; 2 Jarman, Wills (5 ed.) 136-139; 3 Wash-
burn, Real Prop.. Sec. 2457; 11 Am. & Eng. Enc. Law (2 ed.) 372;
*Doe* v. *Ellis,* 9 East 382; *Allen* v. *Ashley School (Tr.),* 102 Mass. 262;
*Nightingale* v. *Burrell,* 32 .Mass. (15 Pick.) 104; *Weld* v. *Williams,* 54
Mass. (13 Metc.) 486; *Brightman* v. *Brightman,* 100 Mass. 238; *Parker*
v. *Parker,* 46 Mass.· (5 Metc.) 134; *Hall* v. *Priest,* 72 Mass. (6 Gray) 18;
*Abbott* v. *Essex Co.* 2 Curt. 126 [1 Fed. Cas. 16]; *Abbott* v. *Essex Co.*
59 U. S. (18 How.) 202 [15 L. Ed. 352]; *Darling* v. *Hippel,* 12 Circ.
Dec. 754; *Richardson* v. *Stockyard Co.* 11 Dec. 367 (8 N. P. 213); 17
Am. & Eng. Enc. Law (2 ed.) 558; *Barber* v. *Railway,* 166 U. S. 83
[17 Sup. Ct. Rep. 488; 41 L. Ed. 925]; *Middleswarth* v. *Blackmore,*
74 Pa. St. 414; *Lawrence* v. *Lawrence,* 105 Pa. St. ·335; *Reinoehl* v.
*Shirk,* 119 Pa. St. 108 [12 Atl. Rep. 806]; *Hackney* v. *Tracy,*
137 Pa. St. 53 [20 Atl. Rep. 560]; *Harkness* v. *Corning,*
24 Ohio St. 416; 1 Washburn, Real Prop. (3 ed.) 87; 2 Wash-
burn, Real Prop. (3 ed!) 690; *Comstock* v. *Comstock,* 23 Conn. 349;
*Matlack* v. *Roberts,* 54 Pa. St. 148; Jarman, Wills 465; *Jones* v.
*Shields,* 14 Ohio ·359; *Parish* v. *Ferris,* 6 Ohio St. 563; *Niles* v.
*Gray,* 12 Ohio St. 320; *Taylor* v. *Foster,* 17 Ohio St. 166; *Piatt* v.
*Sinton,* 37 Ohio St. 353; *Collins* v. *Collins,* 40 Ohio St. 353; *Collier* v.
*Collier,* 3 Ohio St. 369; *Merrick* v. *Merrick,* 37 Ohio St. 126 [41 Am.
Rep. 493]; *McKelvey* v. *McKelvey,* 43 Ohio St. 213 [1 N. E. Rep. 594];
*Canfield* v. *Canfield,* 118 Fed. Rep. 1 [55 C. C. A. 169]; *Mathews* v.
*Krisher,* 59 Ohio St. 562 [53 N. E. Rep. 52]; *Durfee* v. *MacNeil,* 58
Ohio St. 238 [50 N. E. Rep. 721]; *Woodlief* v. *Duckwall,* 10 Circ. Dec.
686 (19 R. 564); *Carter* v. *Reddish,* 32 Ohio St. 1; *Darlington* v.
*Compton,* 11 Circ. Dec. 97· (20 R. 242); *Shaw* v. *Hoard,* ·18 Ohio ·St.
227; *Bunnell* v. *Evans,* 26 Ohio St. 409; *Holt* v. *Hemphill,* 3 Ohio 232;
*Thompson* v. *Gotham,* 9 Ohio 170; *Rhodes.* v. *Gunn,* 35 Ohio St. 387;
*Stambaugh* v. *Carlin,* 35 Ohio St. 209; *Magruder* v. *Esmay,* 35· Ohio St.
221; *Jones* v. *Devore,* 8 Ohio St. 430; *Seventeenth Ward Bldg. Assn.* v.
*Fitzgerald,* 11 Dec. 133 (8 N. P. 160); *Collins* v. *Collins,* 40 Ohio St.
353.

**O. B. Snider, C. W. Everett, King & Tracey, Rhoades & Rhoades, Rathbun Fuller** and **G. A. Bassett,** for defendants in error.

**PARKER, J.**

This action was brought in the court below by Peter Anderson, plaintiff, against the defendants in error, to recover lands and tenements in the city of Toledo, of which he claimed to be the owner, and which properties are in the possession of the defendants, and of which they claim to be the owners. The issues as made up with respect to the disputed questions of ownership were tried. Questions of rents and profits that might become important in a certain event were held in abeyance, by agreement, to await the determination of the former questions. The finding and judgment of the court below was in favor of the defendants upon this issue, so Peter Anderson prosecutes error to this court.

These different defendants are owners of separate and distinct parcels respectively; they have no joint interest in any parcel; but they claim under the same source of title, the same questions are presented as to each, and, therefore, it has been agreed by the parties that no question of possible misjoinder shall be raised; that the questions respecting the titles of each and all shall be determined as if they were properly joined.

In the court below there were other defendants than they who are now defendants in error here; they were parties to this arrangement respecting the joinder; but they were not at all interested in any of the properties with respect to which the question of title was tried in the court below. They undertook to effect a removal of the case to the federal courts; they filed a petition for that purpose in that court, and perhaps took some further action. But the plaintiff, desiring to defeat that object, desiring that the case should remain in the state courts, entered into an arrangement with them, whereby the action was dismissed as to them, and no further effort was made to carry the case to the federal court, but, without objection, the whole matter was submitted in the court below and the judgment of that court obtained.

Anderson, having been defeated in that court and prosecuting error to this court, undertakes to raise the question here that the case was, in fact, removed to the federal court by the action of the parties who were subsequently dismissed from the case, and he insists therefore that the state court was without jurisdiction, and that for that reason, if for no other, the judgment of that court should be reversed.

Lucas County.

I shall not enter into a discussion of that question. Upon the hearing we intimated the opinion that that ought not to be the result under the circumstances; and that it was not the result, chiefly, perhaps, because of the interest of these parties undertaking to remove the case being separate and distinct, so that we have, in fact, a proceeding in error touching a number of actions of ejectment pending here, which actions, by arrangement only were properly heard and considered as one action. Of course, if it shall turn out that we are wrong on this proposition, we have all done a great deal of useless work; but we are content to leave that question without further remark.

There are various assignments of error in the petition in error, some relating to the course pursued upon the trial in the admission of certain evidence, but the chief question is, whether the verdict and judgment below are sustained by the evidence. A verdict for defendant was directed by the court below and judgment was rendered thereon. The defendants in error insist that that judgment may and should be sustained upon several distinct grounds. Before going to this, however, I should say that in order to make a full and fair statement of the case, or perhaps an adequate statement, it seems to us it would be necessary to read the greater part of this bill of exceptions, in which is incorporated the facts agreed upon by the parties, and all the evidence submitted by both sides, because there is no part of it but has some legitimate bearing upon the issues, and some of it, indeed the most of it, is important. What I have said is enough to indicate our judgment that none of the evidence was improperly admitted. We think that, upon some one or more of the questions presented, all of the evidence was admissible.

But to undertake to make a somewhat more succinct statement of facts, I shall adopt in the main, at least, the statement of facts found in the opinion of Judge Severance of the federal circuit court of appeals of this circuit, in *Anderson* v. *Messinger*, 15 O. F. D. 214, a case of like character, involving the same title, though a different tract, and submitted upon substantially the same evidence. That opinion is published in the Ohio Law Bulletin of November 26, 1906. The slight changes made by me in that statement consist of the addition of words enclosed in brackets.

STATEMENT OF FACTS.

Each of the parties derives title from Edward Bissell, a former resident of Toledo. On May 19, 1838, Bissell, claiming to be the owner of the premises, gave his bond to Charles Butler, of New York, for the

Anderson v. Realty Co.

sum of $21,500, payable one year from that date, with interest at 7 per cent, and to secure the payment thereof gave, with his wife, to said Butler, a mortgage on the premises in question. The bond and the mortgage were assigned by Butler on September 23, 1841, to Henry Anderson, a resident of Holly Springs, Mississippi, to secure the payment of his note to Anderson for the sum of $20,000 and interest thereon; and for further security Butler assigned to said Anderson 546 shares of the Erie and Kalamazoo Railroad Company of the par value of $50 per share. Butler having defaulted in the payment of his note, Anderson, on September 19, 1843, filed his bill in chancery in the court of common pleas, of Lucas county, Ohio, to foreclose the Bissell mortgage, making Bissell and his wife, Butler and other parties defendants. These parties, other than Butler, were served with process. Butler was not served and did not appear. That suit was pursued. to a decree which was rendered April 1, 1844, for the sum of $29,139.01. A sale was ordered and a master appointed to conduct it. The mortgaged lands were bid off by Henry Anderson at the price of $6,910. The sale was duly confirmed and the master was ordered to make the proper deed to the purchaser. At this stage of the proceedings and on October 4, 1844, an agreement was entered into between Butler and Anderson, which, after reciting the giving of the bond and mortgage by Bissell, the assignment thereof by Butler to Anderson and the assignment of the 546 shares of railroad stock to secure Butler's note and the above-stated proceedings for the foreclosure of the mortgage, proceeded as follows:

"And whereas, the said Henry Anderson at the instance and request of the said Charles Butler hereinafter contained, is willing to relinquish and surrender to the said Charles Butler the collateral securities, so assigned as aforesaid, for the payment of said. note of twenty thousand dollars, so far as the same may be done .without prejudice or injury to the order obtained for the sale of the said mortgaged premises, and the rights of the said Henry Anderson under the same, and without prejudice to the personal liability of the said Charles Butler, to the said Henry Anderson on the principal debt.

"Now therefore, these presents witness, that in consideration of the premises and for the purpose of giving effect to the same, said Henry Anderson has, on the day of the date hereof, executed and delivered a power of attorney to the said Charles Butler, empowering and authorizing him fully and effectually, if he shall see fit to do so, to release and discharge the said Edward Bissell of and from all personal claim, demand of liability whatsoever, for or on account of the said bond and

18 O. C. C. Vol. 29.

mortgage, but without prejudice to the proceedings, which have been or may be adopted, to effect the sale of the said mortgaged premises, and that the said Henry Anderson has also by instrument in writing released and transferred to the said Charles·Butler the said five hundred and forty-six shares of the Erie and Kalamazoo Railroad Company stock.

"And the said Charles Butler, in consideration of the surrender and relinquishment of the securities, hereby covenants and agrees to and with the said Henry Anderson, that the same shall not be held nor construed in any way to affect or impair the liability of him, the said Butler, on the said note for twenty thousand dollars, and the said Charles Butler also covenants and agrees to and with said Henry Anderson that he, the said Butler, will well and faithfully apply and pay over to the said Henry Anderson, on account of the said note, all sums of money or other valuable consideration which he, the said Butler, may receive or derive by reason of the surrender and relinquishment of the securities aforesaid by him, the said Henry Anderson.

"In testimony whereof the said Henry Anderson and Charles Butler have hereunto respectively set their hands and seals in duplicate this fourth day of October, in the year one thousand eight hundred and forty-four.

"(Signed)                    HENRY ANDERSON,
                          "CHARLES BUTLER."

. Thereafter, on November 18, 1844, the master, in pursuance of the above-mentioned decree and of the sale and the order of confirmation thereof, executed and delivered his deed of conveyance to Anderson, his heirs and assigns, of the premises here in question and which as above stated had been bid off by him.   Prior to the date of this last-mentioned agreement between Butler and Anderson, Butler had, on February 22, 1843, obtained a quitclaim deed of these premises from Bissell and wife.   But this deed was not recorded until after Anderson's death, nor until October 13, 1849, and it does not appear (unless inferentially) that the latter ever had notice of it. After the contract of October 4, 1844, Butler made no further payment on his debt to Anderson during the lifetime of the latter, nor to his representatives, until October, 1849.

On February 28, 1846, Henry Anderson made his will, and on the third day of April following he died, being then a resident of Mississippi. He was at the date of his will, and at the time of his death, a widower. He left two children only, William, born February 12, 1828, and James

Anderson v. Realty Co.

H., born June 25, 1831.  The parts of this will which are now material are here set forth:

"I, Henry Anderson, do make and ordain this to be my last will and testament.  I declare my domicil to be the town of Holly Springs, Marshall county, state of Mississippi.  I revoke the will made by me on the third of March, 1837, and all other wills, if any there be.

"Item.  I give, devise and bequeath to Peter Anderson, Walter Goodman and Peter W. Lucas all my property, both real and personal, legal and equitable in possession, reversion or remainder, and all claims and demands whatsoever, except such right, title or claim to land, money or choses in action as I may be entitled to as one of the agents of the American Land Company and as one of the stockholders of said company; this property they shall hold in trust, and if one or more of them die, the survivors or survivor shall hold in trust for the following purposes:

"They shall pay my debts, other than such as may be owing to the American Land Company, out of moneys on hand and such property as may be sold least injuriously to my estate.  I wish them to collect debts due to me and apply to this purpose.  They may, if they see fit, and can, obtain an extension of time on any debt, and they may pledge my property to raise money to pay debts.  They may sell for cash or on credit, and if at any time they have funds on hand not required for debts or legacies, they may invest the same.  They shall have full power to make titles for property sold and to pay charges for preservation and in all respects have the power of owners, but always as trustees.  I have entire confidence in each of them, and therefore give each the power of all, so that each may do separately what all acting together may do, except in making investments; in that I wish all to join.  The annual accounts of my said trustees, signed by their respective names, shall be binding on my heirs, and shall be conclusively so unless error or fraud be clearly established.  I have directed the payment of debts other than what I may owe the American Land Company. I exclude the debts to the company because that is subject to an account with the company, and I do not wish my trustees to make payments before that account is adjusted.  The adjustment of that account, and the direction and management of the affairs of the company, so far as I have power, right or interest, I place in the hands of Peter Anderson and Walter Goodman, and when they have finally closed it, it shall become a part of the trust created by this article of my will and subject to the control of my said trustees.  By saying 'It shall be-

come a part of the trust,' I mean the effects and proceeds that I may be entitled to as stockholder and agent of the company." * * *

"Item. It is my will that when my son William arrives at the age of twenty-one years, the trustees of the first and second general trust shall deliver to him a settlement of the affairs of the trust, and if my debts are then paid, and as soon as that takes place, they shall put him in possession of one-half of my property, reserving thereout two-fifth parts of said moiety by valuation, which my said trustees shall hold in trust and properly invest and pay over to him at the age of twenty-five years. If my interest in the American Land Company be not brought into the general trust at the time William becomes twenty-one, but is brought in at any time before he arrives at twenty-five, so soon as brought in, two-fifths shall be deducted therefrom and invested and paid over to him at twenty-five, the other three-fifths he shall have as soon as paid in. I find the above does not express my will in this: When I say two-fifths shall be deducted from the interest I may have in the land company for investment and three-fifths to be paid to him, I mean two-fifths of a moiety shall be deducted and three-fifths of a moiety paid over.

"And it is my will that my said trustees hold and invest and **pay** over the remaining moiety of my estate to my son, James, at the respective periods of twenty-one and twenty-five years of age, being governed as to the amounts to be paid at each of the respective periods by the same rules and directions as are above laid down in the bequest to William, and to be governed in all other respects by the regulations laid down concerning the same.

"If either of my sons die without lineal descendants, the one surviving him shall take his estate above bequeathed, and if the surviver dies without lineal descendants, then one-half both of the decedent's original portion, as well as one-half of the portion taken by survivorship, shall go to my brother Peter, the other one-half to such of my brothers and siters as may be living at the time of the death of such surviving son. If my brother Peter be not living at the time of the death of my surviving son, so dying without lineal descendants, then the share he would have taken, if living, shall go to his children living at the time of the decease of my said son, and if there be no children surviving, then the share shall go to my other brothers and sisters surviving at the time of such decease of my son. I make the following explanation:

"The limitation over on the death of my surviving son without

Anderson v. Realty Co.

lineal descendants is intended to take effect if there be no lineal descendants living at the time of the decease of such son. Nothing in the foregoing will be construed as to deprive either of my sons of disposing of their portions by will on their attaining the age of twenty-one years respectively. The above limitations over shall give way to the provisions of such wills."

This will was duly probated in Mississippi, and an authenticated copy of the will and of the probate thereof were thereafter duly filed in the probate court of Lucas county, Ohio, where the will was duly admitted to probate and record as a will from another state.

William Anderson became of age February 12, 1849, and on October 10 of that year Butler obtained from him an agreement in writing, declaring himself to be an heir at law of Henry Anderson and that Henry Anderson "held and intended to hold" the premises in question in trust to secure the payment of Butler's note; that said Henry Anderson had died without declaring said trust in writing, and that, being desirous of carrying into effect his father's wishes and intentions, he had "consented to execute and deliver to said Butler this declaration of the terms and conditions on which he holds the title to the premises above referred to, remaining unsold at the date hereof." And Butler therein agreed to pay to the executors the sum due on his note of $20,000 in installments and at dates therein specified. William died intestate in January, 1850, unmarried and without issue.

James H. Anderson became of age, June 25, 1852. But before that time, i. e., on September 16, 1851, Butler obtained from him a like declaration that Henry Anderson held the premises in trust, but that he having died without having made or executed any declaration thereof, he, James, in order to carry out his father's wishes and intentions, was desirous of making the declaration. But it was therein stipulated that the lands should be held subject to the payment of the principal and interest of the debt due from Butler. On October 1, 1852, there was appended to this document a "memorandum" between Butler and James, containing an agreement to change dates of payment of the note and that the agreement should be taken as supplemental to the agreement to which it was appended. Thereafter, from time to time, Butler made payments to the executors and trustees upon his $20,000 note, but the same had not been fully paid at the time when the executors and trustees settled their trust with James H. Anderson and turned over to him the property and effects coming to him under said will, which was some time prior to May 1, 1860. If

any more paymenus were made on said note, they were made to James H. Anderson. [On April 7, 1860, James H. Anderson, the surviving son of the testator, made a quitclaim deed of the property in question to Charles Butler.] The plaintiff is the only son and child of James H. Anderson, and, as has been stated, was born August 27, 1859.

About May 1, 1860, Peter Anderson and Walter Goodman, styling themselves executors and trustees of Henry Anderson's will, delivered, or caused to be delivered, a quitclaim deed of the premises in question to Butler, reciting therein the recipt of "one dollar" [and other considerations]. The deed recited further that it "being understood that the above described premises were conveyed to Henry Anderson in fee but held by him in his lifetime as a mortgage to secure the payment of a certain sum of money due from Charles Butler, which fact after his death was duly acknowledged under seal by William Anderson and James H. Anderson, his only heirs at law, said first parties covenant, grant, etc. This deed purports to have been made October 1, 1855, and acknowledged October 9, 1855, but, as above stated, it was not delivered—*i. e.*, into the hands of Butler—until about May 1, 1860. On April 17, 1860, Lucas, the other executor and trustee, but signing as executor, executed and, on or about May 1, 1860, delivered to Butler a deed of the same premises in the same form, for a like consideration, and with the same recitals as the deed from Goodman and Peter Anderson. On April 23, 1860, Butler gave a warranty deed of the lands in question to Calvin Bronson, who soon afterward entered upon the premises, and he and his grantees have since occupied and possessed the same, under claim of title through that deed. The defendants hold the title conveyed by the Butler deed to Bronson."

As I have said, counsel for the defendants in error insist that the judgment of the court below is sustainable and should be sustained on any one of four different grounds; namely, (1) because of the deed from Edward Bissell in 1843; (2) because of the deed from the trustees and the executors of the will of Henry Anderson, deceased; (3) because of the deed of the defendant's father, James H. Anderson, surviving son of Henry Anderson, dated April 7, 1860, and (4) because, as they claim, the evidence shows that whatever title Henry Anderson had in this land at any time, was held in trust to secure Charles Butler's note dated July 1, 1844, to Henry Anderson for $20,000. If the judgment may be sustained on any one of these grounds, or upon any ground, of course that is sufficient for the purposes of these defendants in error. We will take up these questions in the order stated.

Anderson v. Realty Co.

First. The deed from Edward Bissell and his wife and Sidney Bissell to Charles Butler, made before the suit for foreclosure was begun, but not filed for record until more than six months, indeed, not until several years after its execution, could not affect the title of a *bona fide* purchaser, having no knowledge of the deed. While there are circumstances tending, we think, to show that Henry Anderson had knowledge of this deed when the foreclosure proceedings were in progress, and before he purchased at the judicial sale, to some of which circumstances reference may be made in the course of this opinion, we do not deem them of sufficient weight to justify a finding that he was so fully acquainted with this fact and yet so ignorant of the qualifying facts as to deprive him of the protection accorded to a *bone fide* purchaser with knowledge. For even if he had knowledge of this deed, it is certain that he also had knowledge of the agreement of October 4, 1844, (to which he was a party), which shows clearly that Charles Butler was not standing upon this legal title in opposition to the title to be made under the foreclosure proceedings, wherein the sale to Henry Anderson had already been made and confirmed (and in pursuance of which proceedings a deed by the master was made on November 18, 1844), and that Charles Butler was for a valuable consideration consenting and agreeing that these proceedings should carry the legal title to said purchaser. We hold, therefore, that the defendants cannot maintain their defense, standing upon the deed of February 22, 1843, form Edward Bissell and wife and Sidney Bissell to Charles Butler.

Second. As to whether the decree and sale in the foreclosure suit and the deed made in pursuance thereof, cut off the rights and equities of Charles Butler as mortgagee under the mortgage from Bissell to Butler and as a pledgor of the Bissell mortgage. It is clear that the assignment to Anderson was not absolute as shown by the form or terms of the assignment, wherein it is set forth that the assignment is upon a trust declared in a certain deed, though what deed or what form of trust, or declaration of trust, we are not advised. And this is shown by subsequent declarations and transactions. It is thereby made evident that the note and mortgage as well as the bond mentioned in the agreement were pledged as collateral security upon the note of Butler to Anderson for $20,000. We do not feel called upon to decide the mooted question whether the decree and sale standing alone would cut off the rights of Butler as mortgagee and pledgor, since there appears to be other competent and material evidence in the circumstances surrounding these transactions that may have a material and modifying influence

upon the judicial proceedings as disclosed and affected by the record alone.

Charles Butler was made a party defendant, but was not served with process, and the allegations of the bill and the prayer thereof for relief, and the decree, do not any of them, in express words or by necessary implication, seek to cut off or foreclose any interest of Charles Butler. Notwithstanding the absence of words expressing a desire or purpose of cutting off such persons, perhaps that might have been the result had Butler been served with process and had he then allowed the decree to be entered without opposition or the assertion of any claim or interest in the property or securities on his part. We need not say; he was not brought in; and he does not appear to have said or done or acquiesced in anything that might prejudice his rights beyond entering into the agreement of October 4, 1844. It will be observed that this agreement was entered into after the decree and sale. It did not purport to modify or to attempt to modify the rights of the parties under the decree. The decree as it was entered and recorded did not expressly bar Butler from asserting his equity, and in our opinion it did not in law necessarily and conclusively have that effect, but it was consistent with the preservation and the continuance thereof, after the decree and sale precisely as before, so that any understanding of the parties that such rights should be preserved and continued could be given effect without running counter to such decree. One of the important effects, the all important effect of such understanding would be to continue Anderson as trustee for Butler, whereby he would hold the legal title in trust for Butler.

It is apparent to us that Charles Butler and Henry Anderson were not only business associates, having large and important interests in common, and intimate relations as such, but that they were friends, and that each had full confidence in the integrity and good faith of the other; and I may here add that we find nothing in this or subsequent transactions to indicate that such confidence upon the part of either was misplaced on the one hand or on the other violated. We are persuaded by the evidence laid before us; by the course of this judicial proceeding—I mean the foreclosure suit;—the absence of evidence therein of a purpose to foreclose or cut off the interests of Butler; the failure to serve him with process; the apparent indifference upon that subject; the terms of the agreement of October 4, 1844, and as well by the subsequent transactions between Butler and persons intimately connected with, and interested in, the family and in the estate of Henry

Anderson, that this judicial proceeding was not designed to be adversary so far as Charles Butler was concerned, but that the sole purpose thereof was to foreclose the interest and estate of the Bissells, and secure a title that would be good, not only as against them but (a thing not certainly accomplished by the quitclaim deed) as against their creditors, or anybody who might claim through or under them.

It was intended, we are convinced, to effectuate the same purpose as was accomplished in a measure by the quitclaim deed, only that the legal title under the decree was to remain in Anderson, and be recognized as the superior, the dominant and the true legal title until the note for $20,000 should be paid, when it was to be conveyed to Butler. The quitclaim deed would then stand as a fortification of that title.

It is evident too that after the making of the quitclaim deed Edward Bissell had no farther interest in the property or the matters involved, beyond being protected against personal liability on his note for $21,500.

We are convinced from all the circumstances, the course of dealing of the parties, the manner in which this decree was entered without bringing Butler in, as well as by the terms of the agreement, and especially by what resulted to Bissell and Butler, that it was agreed upon between Butler and Bissell, when their quitclaim deed was made, that Bissell should be protected against the personal liability mentioned, and that it was in pursuance of that agreement that the stipulation to so protect Bissell was made in the agreement between Henry Anderson and Butler, after the sale and foreclosure proceedings and before the deed made in pursuance thereof. This is the only apparent rational explanation of the deed from Bissell to Butler, and constitutes the only apparent consideration for that deed; and the release of this claim of over $20,000 as determined by the decree manifests a purpose, we think, on the part of Butler, to simply acquire the interest of Bissell in the property; and this arrangement was so readily acquiesced in by Anderson as to indicate that he was looking to Butler as his debtor for the satisfaction of his claim, and not to Bissell for any advantage under his decree. This proceeding in equity seems to have been in a large measure, in fact, amicable, (although in law adversary), as to Bissell, and to have been carried forward for the purpose of carrying out the arrangement made between Bissell and Butler, whereby the latter was to acquire the title to the lands, and the former was to be absolved from personal liability on his note, and in pursuance of which plan the quitclaim deed was made.

The time is too remote to admit of clear and positive proof of these matters in the absence of full and clear written declarations upon the subject. To our minds the whole transaction connected with the decree, and the subsequent conduct of the trustees and others interested, in never claiming that the equitable ownership, as well as the legal title to these premises was in Henry Anderson, but on the contrary, acknowledging the equity in Butler, point to and justify that conclusion.

The terms of the agreement of October 4, are not so clear as to be free from doubt upon this subject, and yet there are declarations, or provisions in it, which, taken in connection with the other circumstances, seem to be reconcilable to this theory and to no other. At the time this agreement was entered into as already stated, the property had been sold under foreclosure, and the price was fixed and known. It was $6,921; and yet in the agreement the liability of Butler seems to be recognized for the whole $20,000, which would be entirely inconsistent with the theory that this $6,921 was to be credited upon the $20,000 note; and there is no evidence tending to show that it was ever credited thereon; but there is much to the contrary, including the fact that the note appears to have been fully discharged by other payments, and the fact that subsequently the trustees and executors in stating the account upon the note make no reference to this credit.

It is also provided in this agreement, it is true, that these transactions shall be without prejudice to the proceedings which have been or may be adopted to effect the sale of said mortgaged premises; but that we think is consistent with the idea and arrangement that as between them the sale and the deed made in pursuance of the sale was to convey the legal title, and that only.

The trustees and executors were men in whose capacity and integrity and friendly interest the testator, Henry Anderson, seems to have had the fullest confidence. Nothing in their conduct of the affairs of his estate seems to justify a suspicion that they were not worthy of this confidence. One of these was his brother Peter, one who appears to have been a man of education and business capacity, and who had been entirely familiar with the affairs of the testator, Henry, and one upon whom this property in Toledo, if affected by the will, would have devolved in a certain contingency; one to whom the use and the care of large estates and interests were given by Henry under his will. There is nothing to indicate that these executors and trustees were lacking in vigilance, industry, honesty or capacity, or that they were men easily persuaded without sufficient evidence to surrender valuable in-

terests of the estate. Yet they were persuaded that the title to this property was held in trust by their testator, precisely as the mortgage had been held, as security for the note of $20,000, and they settled with Charles Butler on that basis, giving no credit for the $6,921, the purchase price of the property at judicial sale; and, on October 1, 1855, Peter Anderson and William Goodman, two of the executors and trustees, as such, executed a deed which the evidence indicates was placed in escrow in a bank in New York, pending the payment of the balance due on the note to Charles Butler, and subsequently (presumably on full satisfaction of the balance due on the note by payment or other security—the latter indicated as preceding, and the former as following, the event) this deed was delivered to Charles Butler; and a like deed was made by P. W. Lucas, the remaining executor, on April 16, 1860.

Though Peter Anderson may have been influenced to this action to some degree by the acknowledgments of the sons of Henry that this property was so held in trust—that is, insofar as such acknowledgments affected them or their interests—yet we cannot see that their action or declarations would influence him to surrender his own interests in this property without careful and independent investigation on his own behalf; nor do we think he was a man of such character, judging by his correspondence and other evidence before us, that he would heedlessly imperil the interests of children yet unborn, if by the will they seemed to have any interests limited to them.

And as for the sons, William and James H., we find no evidence that they were so imbecile or gullable that they would make haste to surrender their property on the bare claims and statements of one adversely interested, or without the most convincing evidence. Nor can we find that Charles Butler, in obtaining such concessions, was guilty of any wiles or finesse, or that he made undue appeals to their sense of filial affection, or of their duties to carry out the contracts and wishes of their father.

On April 7, 1860, after he had succeeded to the interests of his then deceased brother William, and after he had reached the age of twenty-nine years, James H. confirmed his former action by his quit-claim deed of that date to Butler.

This property, the title to which is in controversy here, is not specifically referred to in the will, but would be affected by the general terms of disposition therein. And supposing this trust in favor of Butler to be impressed upon the title, there can be no doubt, we think,

of the authority of the executors and trustees, upon making collection of the balance due on the note of $20,000, to convey this property to Butler, whether such conveyance were made before, or after the time that testators youngest son became twenty-five years of age; so that in this view of the case we deem it unimportant whether the deed from the executor was in fact placed in escrow at the time it bears date, or was delivered for the first time in 1860, though we see no reason to doubt the fact asserted by Butler and assented to, by silence at least, on the part of one of the executors, and by James H. Anderson, when the matter is distinctly stated to them by Butler, that the deed was deposited in escrow as claimed by the defendants at about the time of its execution.

The fact that Butler made no payment on the $20,000 note from the time of the agreement of October 4, 1844, until after the death of Henry Anderson seems to throw no light upon this question. It is quite as consistent with one theory as it is with the other, for, confessedly, he owed at least a large balance upon the note; so that his duty to pay existed in any event.

Soon after the death of Henry Anderson (and not improbably impelled thereto by his death and thought of possible consequences affecting this property) Charles Butler seems to have made examination of his papers and concluded that there was not a sufficiently clear and definite declaration of his interests contained in the agreement of October 4, 1844, to protect him, and so he proceeded to procure such declarations from the sons of Henry Anderson. These declarations were made near to the time of the events recited. It is not improbable, indeed it seems to us altogether probable, that the truth of the matter was so well known in the family and by the declarants that the declarations were promptly and cheerfully made on request. It is worthy of notice that the declaration signed by James H. Anderson on September 16, 1851, is witnessed by his Uncle Peter and by Walter Goodman, two of the executors and trustees aforesaid. The trust was subsequently recognized by the executors in their deeds to Charles Butler.

Charles Butler lived until December 13, 1897, James Anderson lived until September 16, 1902, and yet we are not apprised that the slightest doubt or suspicion was ever raised by word or act of anyone interested, of the honesty and correctness of these transactions of from forty-five to sixty years ago until suit was begun in the Messenger case in 1904. In the meantime this property has been in the possession of those claiming under deeds made by Butler in 1860, has had increased

### Anderson v. Realty Co.

greatly in value, and has been greatly improved. Something is due to the principle that the repose of titles founded on long past transactions, the full and exact evidence whereof may have disappeared, shall not be lightly disturbed. The father, the uncle and the grand uncle of this plaintiff, who were interested pecuniarily in maintaining the title now asserted by him—that is, the claim that the testator was the equitable owner as well as the legal holder of the title to this property—ought not to be found to have carelessly and inconsiderately relinquished such claim, unless the evidence to that effect is very satisfactory. That through any selfish move to derive any advantage to themselves, they undertook to cut off this plaintiff, their kinsman, and the son of one of them, or cast a cloud upon his title, is not hinted at, and we take it is not open to suspicion.

Though it may be impossible to state any exact account respecting the note of $20,000 and the payments upon it, we are convinced by the evidence that it has been fully paid, and that without crediting the $6,921, the purchase price of the property at judicial sale; and that thereby all the interest of the estate of Henry Anderson in this property has been fully extinguished, and that the deeds from the executors were given in performance of a duty which a court of equity would have compelled them to perform, had its action been necessary and had it been invoked. The statement of the account made by counsel for the defendants would indicate that the note had been fully paid and over paid without this credit of $6,921; but that account is inconsistent with the declarations of Mr. Butler made in letters. He states certain balances due at certain dates, and the credits—the amounts shown to have been paid since then—do not appear to be great enough to discharge these balances. Yet the deed deposited in escrow was surrendered to Mr. Butler upon his proposal that upon its delivery he would turn over to the trustees a certain cash payment of over $2,000 which he was to receive upon a sale of this property to Mr. Bronson, and the securities he took from Bronson for $15,000. This, of course, was more than ample to satisfy the balance due upon the note for $20,000. This arrangement having been made and effected, there being subsequently no claim made of any balance on this debt, and the note not being presented here, or shown to be in the possession of the Andersons, if indeed it is in existence, we are authorized to find from the circumstances that the note was fully paid. But if not fully paid, if there is any balance due upon it, of course the remedy of the plaintiff is not that here invoked.

Lucas County.

The plaintiff, arguing upon the assumption that under the will of Henry Anderson he took a fee simple in remainder on the death of his father, James H. Anderson, contends that the acts and declarations of the executors and trustees, and also those of the uncle and father of plaintiff, tending to show that the legal title while it rested in the testator was impressed with the alleged trust in favor of Charles Butler are not any of them competent evidence as against him and his title to establish that fact, since all of those acts and declarations occurred and were made after the title had been cast upon plaintiff at the death of the testator and by his will: That the executors and trustees and his uncle and father, or any of them, did not stand in such relation to his title as privies or otherwise that they could, by acts or declarations of the character shown, in derogation thereof, affect his said title.

Assuming for the time, to meet this question, that the plaintiff was entitled to such remainder of the estate of his grandfather, we recognize the well-settled rules that prevent the acts or admissions of strangers to plaintiff's title from impairing it in any degree. But we believe that the executors and trustees were not quite strangers to the titles that are derived through the will of the testator, since such titles were to the residue of such estate of the testator remaining after the executors had discharged their trust.

The title and dominion over all the property is vested in the executors and trustees, by the following provisions of the will:

"I give, devise and bequeath, to Peter Anderson, Walter Goodman and Peter W. Lucas, all my property, both real and personal, legal and equitable in possession or remainder, and all claims and demands whatsoever * * *. This property they shall hold in trust, and, if one or either of them die, the survivors or survivor shall hold in trust, for the following purposes: They shall pay my debts * * * out of money on hand and such property as may be sold least injuriously to my estate. I wish them to collect debts due to me and apply to this purpose. They may, if they think fit, and can, obtain an extension of time on any debt, and they may pledge my property to raise money to pay debts. They may sell for cash or on credit, and if at any time they have funds on hand not required for debts or legacies, they may invest the same. They shall have full power to make titles for property sold and to pay charges for preservation, and in all respects have the power of owners, but always as trustees.

"I have entire confidence in each of them and therefore give each the power of all, so that each may do separately what all acting to-

gether may do, except in making investments; in that I wish all to join. The annual accounts of my said trustees signed by their respective names shall be binding on my heirs, and shall be conclusively so unless error or fraud be clearly established.''

The will confers extensive power on Peter Anderson and Walter Goodman, respecting testator's interests in the American Land Company, and provides with respect thereto that: ''They shall have power to execute all papers necessary for a settlement of the agency and all papers executed by them shall be binding on my heirs,'' and with respect to any lands thus devised the will provides ''a title from them (the trustees) shall be good and sufficient to a purchaser.'' The will further provides that when this interest is finally ascertained it shall ''become a part of the trust first created.'' And then is repeated the provision, ''their accounts signed by them respectively shall be evidence binding on my heirs of their correctness unless error or fraud be clearly shown.'' . The execution by the executors and trustees of the deed to Charles Butler in performance of the trust, may not be within the strict letter of the provisions touching accounts, but it is incident thereto, since without it the claims could not be collected; and an account made of such collection should report the making of such deed. But this rule fixed by the will, touching the incontestibility of the accounts, need not be relied upon, since it is but the declaration of a rule of law, applicable to all the transactions of the executors and trustees within the scope of their powers, and it applies as fully to the giving of the deed as to the making accounts of the receipt or the disbursement of money. It is significant, however, as indicating the great confidence of the testator in the executors and trustees, and his desire that their action in the premises might stand unquestioned.

By the term ''heirs'' in these provisions, of course, .the testator means his devisees and legatees, who take all of his estate by the terms of the will, and who are also in fact his heirs at law.

Then follow the devises already read, _i. e.,_ the provisions for ''paying over'' and ''delivering'' the residue of the estate to those designated, and for ''putting them in possession'' of the same, and other provisions, none of which in any way limit or qualify the almost unlimited power and authority given in the provisions just noted. It is evident that in the lawful and proper exercise of these powers to collect and to deal with the property as owners, and make titles thereto, the executors might collect a debt secured by a mortgage and release the mortgage; and it seems to us equally clear that they might collect a ·

Lucas County.

debt secured by a trust deed of like character as a mortgage and, upon its collection, might convey the title to the equitable owner; and that the determination of the questions whether a debt existed and should be collected and whether a title was held as security therefor and should be surrendered on payment, were fully committed to them; and whatever they did and declared in the premises (such as the taking and preserving in permanent form of evidence of the facts upon which they acted, and including the declarations of the brothers, William, and James H., whereby the correctness and propriety of their acts as trustees would be made manifest, and the evidence would be preserved for their protection, and for the information, satisfaction and protection of all persons interested in the estate then or thereafter) were parts of the *res gestae,* so that the aforesaid declarations should be deemed verbal acts forming a part of the transactions of the executors and trustees; and such acts of the executors and trustees, and as well such verbal acts of the uncle and father of the plaintiff we regard as competent evidence against the plaintiff, affecting his title, which was by the will made subject to such action of the executors and trustees.

We do not regard the declarations of the uncle and father as admissions of privies, and therefore binding upon the plaintiff, but as statements adopted by and made a part of the representations of the trustees, of facts by them found and of the purpose they had in view, and as part of the evidence upon which they proceeded, and in pursuance of which they declared the fact of the existence of the trust, and made the deed to Butler—declarations and acts of the trustees binding upon their successors in title, or those who took the title subject to their lawful action under their powers—acts subject to being overturned only on clear proof of fraud or mistake. These declarations of the uncle and father, standing alone, might be of no weight, might not even be admissible, but they are competent and important because adopted by the executors and trustees in their deeds, wherein they say that it is "understood that the above-described premises were conveyed to Henry Anderson in fee but held by him in his lifetime as a mortgage to secure the payment of a certain sum of money due from Charles Butler to Henry Anderson, which fact after his death was duly acknowledged under seal by William Anderson and James H. Anderson, his only heirs at law." These findings and declarations of the fact that the trust existed we hold were within the scope of the authority of the executors and trustees, and were binding on the title;

Anderson v. Realty Co.

clearly so when acted upon by the *cestui que trust* under circumstances giving rise to estoppel.

Can it be believed by one reading this will that the executors and trustees, on finding that such a trust in favor of Butler existed, were powerless to carry it into execution, because, mayhap, in the distant future a grandchild of the testator might be born, and, in a certain contingency, a share of the residue of this estate might devolve upon him under the will? Were the powers of the executors and trustees so limited and hampered in the settlement of the estate, in collecting claims of the estate and making disposition of securities for such claims, that their action in the premises must be deemed futile and of no weight, even as evidence, against the claims of such afterborn grandson, asserted more than half a century after the settlement? We cannot think so. Suppose it was true, and was clear to the trustees, that the interests of the estate demanded the collection of the claim rather than the retention of the real estate; what then? Must they retain the land and lose the claim? We do not doubt the right of such grandson to raise the question, at this late day (assuming that he took the estate he claims under the will) but we hold that what was done by the executors and trustees in the premises was done in the execution of power plainly conferred by the will, and that instead of "fraud or mistake" that might annul their action appearing, the proofs strongly tend to show that they acted not only in good faith, but wisely and justly.

The foregoing is said in justification of the admission and consideration of this evidence on the question of the existence of the trust in favor of Butler, but this evidence is needless in support of the finding of such trust, for there is sufficient in the record to justify that finding if the evidence of what occured after the death of Henry Anderson were all discarded. The making of the deed by Bissell to Butler; the adjustment of their affairs, whereby Bissell was to be relieved from heavy pecuniary obligations on the note pledged to Anderson, and whereby Butler, in consideration thereof, took over the mortgaged real estate; the fact that Anderson appears to have taken no part in this adjustment until later, when he was called upon to do so, and that he then readily acquiesced, surrendering a claim against Bissell of over $20,000 (as fixed by judicial decree) for no apparent recompense; the terms of the agreement of October 4, 1844, wherein it is plainly implied that the liability of Butler on the note of $20,000 is not reduced and is not to be reduced by the $6,921; the fact that it is not made to appear that when the note came to the executors, at least a year and an half later, the credit of $6,921

was indorsed upon it, though the testator had held it for that period after the foreclosure sale; the fact that no property in Toledo is referred to in the will, and that Henry Anderson, a resident of Tennessee had not invested in this property before the foreclosure sale, but had only taken a mortgage as assignee and as collateral security, are quite enough to satisfy us that he regarded his interest in the property after, as well as before the sale, as mere security.

Regarding the contention, that, at the time of these transactions and declarations, the powers of the trustees were at an end, so that they could not bind or affect the estate of the devisees, we have to remark that the will does not provide expressly for the cessation of such power at any specific period. The will contemplates the completion of their duties and the cessation of their authority on the youngest son's coming to the age of twenty-five years, which event occurred on June 25, 1852 at which time the remainder of his share of the estate was to have been turned over to him; but we do not regard that as fixing a time when said powers necessarily ceased entirely and *ipso facto*. If the persons —the sons—who then became entitled to the possession of their estates, consented to the executors and trustees' continuing as such in the management of the estate, to the end that this unfinished business might be closed up, this claim collected and the securities therefor surrendered, we think it was competent for them to do so; that no one else would be interested, or had a right to object; certainly not one who was not then entitled to come into possession of any part of the estate; for it was a matter affecting no right but that of possession; and, in the closing up of such business, the executors and trustees would not, therefore, be acting as agents of the testator's sons, but they would be acting as executors and trustees. Perry, Trusts Sec. 498.

It is to be noted too that the determination and declaration of the existence of the trust (which we hold the executors and trustees were competent to make so as to establish the fact and bind all interested in the title) was made before the youngest son became twenty-five years of age; and, therefore, while the executors and trustees had an undoubted right to take such action, and this was effective to establish the fact even though there may have been no effectual delivery of their deed until later and this determination of the fact is the important thing, for upon that being done by the executors and trustees, and afterward acted upon by Charles Butler, the relations and rights of the parties were so fixed that the trust became enforcible against the heirs and devisees, unless this action should be set aside because of fraud or mistake;

Anderson v. Realty Co.

and it follows that the making of a deed by the persons vested with title to the *cestui que trust,* or his grantees, on payment of the claim, could have been compelled by Butler, and could even now be compelled, if needful, at the hands of the plaintiff.

But as before indicated, basing our finding upon the presumption arising from its date and the subsequent possession by the grantee, that the deed was delivered, at least tentatively or in escrow, at or about the time it bears date, so that the title then passed from the estate, we hold that when the deed, though the final delivery may have occurred after the cessation of the authority of the executors and trustees, came into the hands of Butler, it took full effect by relation as of the date of its execution; *i. e.,* October 1, 1855.

This conclusion makes it unnecessary to examine any other question presented here; but there is one other question that has been very fully and ably argued by counsel, and is so interesting that we do not feel inclined to pass it by in silence. I refer to the question (third) of the character of the estates taken by the sons William and James H. under the will of their father, and connected therewith, the estate, if any, taken by the plaintiff under the will of his grandfather; for it is apparent that if an estate in fee simple in the whole property devolved upon James H., under the will, and upon the death of his brother William (as claimed by the defendants) then the deed from James H., to Charles Butler on April 7, 1860, which stands unimpeached, carried a fee simple estate to the grantee, and the plaintiff has no title or cause of complaint, even if the title of James H. were not affected by a trust in favor of Butler; whereas, on the other hand (assuming the absence of such trust), if the plaintiff takes title under the will to a fee simple by entailment or in remainder, as he contends, this title may be wholly unaffected by the transactions recited as having taken place between or on the parts of Butler and the executors and trustees of Henry Anderson, and the sons of Henry Anderson, or any of them. If another court having jurisdiction to determine the rights of these parties independently of our judgment, or upon reversing it, should differ from us upon the question of the trust, then this question would become one of vital importance, and we believe it is due to all parties in interest that we should give our views upon it. The question arises upon the item in the will, which reads as follows:

"It is my will that when my son William arrives at the age of twenty-one years, the trustees of the first and general trust shall deliver to him a settlement of the affairs of the trust, and if my debts are

then paid, and as soon as that takes place, they shall put him in possession of one-half of my property, reserving thereout two-fifth parts of said moiety by valuation, which my said trustees shall hold in trust and promptly invest and pay over to him at the age of twenty-five years. If my interest in the American Land Company be not brought into the general trust at the time William becomes twenty-one, but is brought in at any time before he arrives at twenty-five, so soon as brought in, two-fifths shall be deducted therefrom and invested and paid over to him at twenty-five, the other three-fifths he shall have as soon as paid in. I find that the above does not express my will in this: When I say two-fifths shall be deducted from the interest I may have in the land company for investment and three-fifths be paid to him, I mean two-fifths of a moiety shall be deducted and three-fifths of a moiety paid over.''

"And it is my will that my said trustees hold and invest and pay over the remaining moiety of my estate to my son James at the respective periods of twenty-one and twenty-five years of age, being governed as to the amounts to be paid at each of the respective periods by the same rules and directions as are above laid down in the bequest to William and to be governed in all other respects by the regulations laid down, concerning the same.''

"If either of my sons die without lineal descendants, tne one surviving him shall take his estate above bequeathed, and if the survivor dies without lineal descendants, then one-half of the decedent's original portion, as well as one-half of the portion taken by survivorship, shall go to my brother, Peter, the other half to such of my brothers and sisters as may be living at the time of the death of such surviving son. If my brother, Peter, be not living at the time of the death of my surviving son so dying without lineal descendants, then the share he would have taken, if living, shall go to his children living at the time of the decease of my said son, and if there be no children surviving, then the share shall go to my other brothers and sisters surviving at the time of such decease of my son. I make the following explanation: The limitation over, on the death of my surviving son without lineal descendants, is intended to take effect if there be no lineal descendants living at the time of the decease of such son. Nothing in the foregoing will shall be construed as to deprive either of my sons of disposing of their portions by will on their attaining the age of twenty-one years respectively. The above limitations over shall give way to the provisions of such wills.''

Anderson v. Realty Co.

We are required to seek the intention of the testator, and, if possible, to give it effect, provided it does not run counter to any positive provision of law. The intention of the testator is the pole star to guide and control us. Insofar as the provisions may be affected by any rules of law, either statutory or judicially determined, the *lex rei sitae*—in this case, the law of Ohio—controls.

Before encumbering and perhaps confusing our minds by rules of construction, more or less technical, and by definitions of estate and discussion of their qualities and characteristics, let us try to ascertain from the language used what disposition the testator intended and attempted to make of his estate. What course of devolution he intended and attempted to mark out for it. We shall not attempt to enter into the subject at great length, nor to analyze the language with any great minuteness, though we commend the work of counsel who have done so, and acknowledge that it has been of great assistance to us. As we read these provisions of the will the testator intended and designed that, in the first instance, a moiety of his property should go to each of his sons, and that each should have the share of the other upon the death of such other, provided such other died without lineal descendants living at the time of his death, or did not dispose of his share or moiety by will. He further intended and designed that if the surviving son succeeded to the estate of the deceased brother as before provided — *i. e.,* upon his dying without lineal descendants, or without having disposed of his share by will—and if such surviving son should also die without lineal descendants and without having disposed of the property by will, it should go to decedent's brother Peter, and other brothers and sisters of the testator then surviving, in certain shares and subject to certain limitations that need not be noted.

The son William died intestate and without lineal descendants, so that his portion devolved upon his surviving brother James H., father of the plaintiff, Peter. James H. died intestate, leaving a lineal descendant, the plaintiff, his son Peter, so that the contingency upon which the testator's brother Peter, or the other brothers and sisters might come into the property never has arisen and never can arise.

But James H. made the deed before mentioned to Charles Butler, and it was sufficient in form to carry a fee simple to the grantee, and the defendants contend that it did carry such estate, while the plaintiff contends that the grantor was not vested with a fee simple estate or with power to convey such estate, and that the grantor had and conveyed but a life estate, and that the plaintiff takes under the will a

remainder in fee simple. Did the mention of the possible lineal descendants of the surviving son amount to a devise to them? This is the crux of the problem; and for its solution we are now obliged to resort for aid to certain rules of construction, for the intent of the testator cannot be gathered with clearness and certainty from the words of the will. His intent must be in a measure inferred, and the presumption is that it was in accordance with the results worked out by the application of well-settled rules of construction.

We think there is some language in the will, and an absence of some words from the will, both tending to show that a fee simple, though a defeasible fee, was intended to be devised to the sons. It is true there are no words of inheritance in that connection, and it is somewhat curious, considering that much of the language of the will displayed, upon the part of the person who drafted it, a knowledge of law and legal terms, that no words of inheritance are used with respect to any interest devised, either to the executors and trustees or to the sons, or to the brothers and sisters of the testator; so that nothing can be argued from the use of such language in one part of the will with respect to one estate and its absence in another part of the will with respect to another devise as may often be done in the construction of wills. Saying nothing of the express provision with respect to the sons, it is apparent that the testator understood that he could devise a fee without the use of words of inheritance, for certainly the limitation over to the brothers and sisters of the testator was intended to be of an estate of inheritance, though no words of inheritance were used there.

It is a well-settled rule that words of inheritance are not required in a will to convey a fee, but, in the absence of provisions indicating a different intention, a purpose to devise the whole estate of the testator, even if a fee simple, will be presumed.

I may mention that we do not think that the rule declared in Rev. Stat. 5970 (Lan. 9509) has any special application here, for it is undeniable that the testator devised his entire property and all interest therein to some one, and this statute does not aid us in determining the question presented here as to the interest taken by the devisees respectively. The rule first mentioned is independent of the statutory rule, and was announced and in force as a rule of property before the adoption of the statute. See cases of *Smith* v. *Berry*, 8 Ohio 365; *Thompson* v. *Hoop*, 6 Ohio St. 480. By this rule we are authorized to infer that the testator intended to and did devise a fee simple estate in the moiety of his property to each of his sons, but, the share of each

Anderson v. Realty Co.

being subject to divestment and to devolve upon the survivor in case of the death of either without lineal descendants, and without his having disposed thereof by will, and the estate of the survivor in both cases would likewise be subject to divestment and to devolution upon the brothers and sisters of the testator as before stated, if such surviving son should die without lineal descendants and without disposing of the property by will.

The estate so devolving upon the surviving son, and that so devolving upon brothers and sisters of the testator, would take effect by executory devise. I say this is the course that the will prescribes for the devolution of the property upon certain persons designated, unless this is further qualified by the mention of such lineal descendants.

It is not expressly provided by the will that any estate shall vest in such lineal descendants of and surviving the sons of the testator, so if any estate devolved upon the grandson, Peter, the plaintiff, it must be because of some rule of construction authorizing an inference of such intention; and it must be of such force and potency as to destroy the opposing inference, that defeasible estates in fee were devised to the sons. In the course of the discussion the rule in Shelly's case and Rev. Stat. 5968 (Lan. 9507) abrogating that rule and establishing a different rule, the opposite in its effect, have been brought to our attention; but we cannot see that either rule can operate here until the controverted point has been settled. In other words, these rules do not help us to solve the question, for the contention of the defendants is, that the will does not purport to limit any estate to the lineal descendants, so that the words "lineal descendants" cannot be regarded as either words of limitation, whereby the estates of the deceased sons are increased from estates for life to estates tail, nor words of purchase, whereby the lineal descendants take fee simples in remainder; but the defendants insist that the provisions respecting lineal descendants are simply the statements of conditions or events upon the happening of which the estate in fee simple devised to the sons are to be determined and the fee is to devolve upon certain others designated. What effect then is to be given to the mention of the lineal descendants, more especially in the provisions as to the shares or estates of the surviving sons?

In our opinion the law of Ohio as declared by the Supreme Court of the state in several reported cases, clearly and distinctly resolves this question in favor of the contention of the defendants here and against that of the plaintiff, though there is one case decided by that court out of line and harmony with the general course and tenor of its decisions.

I refer to the case of *Shaw* v. *Hoard,* 18 Ohio St. 227, much relied on by the plaintiff. From the cases of *Parish* v. *Ferris,* 6 Ohio St. 563; *Niles* v. *Gray,* 12 Ohio St. 320; *Taylor* v. *Foster,* 17 Ohio St. 166; *Piatt* **v.** *Sinton,* 37 Ohio St. 353; *Collins* v. *Collins,* 40 Ohio St. 353 and *Durfee* v. *McNeil,* 58 Ohio St. 238 [50 N. E. Rep. 721], we deduce the rule (and we deem it a necessary deduction from those cases), that where a testator devises his realty to one by terms describing a fee simple, or from which a purpose to devise a fee simple is inferable, and follows this by a limitation over in the event that the aforesaid devisee shall die "without issue," or "without children," or "without descendants," or "without heirs of his body," or "legitimate heirs," or the like, this amounts to a limitation over on a definite failure of issue surviving the aforesaid devisee at the time of his death; and in such case, no estate is limited to such "issue" or "heirs of the body" or the like, but the provision simply declares the condition or contingency upon which the limitation over shall take effect. It qualifies the fee devised to the first mentioned devisee, making it instead of an unconditional fee smiple, as it would otherwise be, a conditional or defeasible fee.

That the limitation over on failure of lineal descendants of the surviving son, James H., was upon definite failure of issue, *i. e.,* failure of such surviving issue at the death of such son, does not admit of doubt, and is not arrived at by the application of any rules of construction, such as were applied in the case of *Parish* v. *Ferris,* 6 Ohio St. 563; but is found in the express declaration of the will in the so-called "explanation," to wit: "The limitation over on the death of my surviving son without lineal descendants is intended to take effect if there be no lineal descendants at the time of the decease of such son;" so that the only debatable question is that touching the effect of such limitation over on definite failure of issue. As before stated, the decision in the case of *Shaw* v. *Hoard, supra,* does not seem to be in harmony with these cases, but we call attention to the facts that in that case no reference is made to the case of *Niles* v. *Gray, supra,* previously decided. *Shaw* v. *Hoard,* is not referred to in any of the decisions following it; the court took pains to say that it was not decided by the application of any established rules of construction, but was decided to carry out what appeared to be the clearly manifested intent and the purpose of the testator; the question was not raised between owners claiming under conveyances from the person to whom the first estate was granted, but was triangular and between the issue of a certain devisee and the general heirs (on whose behalf no brief was

### Anderson v. Realty Co.

filed in the case) and the claimant under the executory devise. It was decided by a divided court. Though the court does not exactly apologize for the decision in the opinion, it takes great pains, as we read it, to guard against the use of the case as one laying down a rule of construction. It has not been followed since, but has been ignored, and we think that it should not be regarded as establishing a rule in opposition to that upon which the cases hereinbefore were necessarily based. All arbitrary rules of construction must give way to the primary rule that the manifest intention of the testator must be given effect, and so this rule, apparently applicable to *Shaw* v. *Hoard*, had to give way in that case to an ascertained intention to accomplish a different result from that to be worked out by the application of the rule, and thus considered, the decision in that case is justified and does not tend to disturb the rule.

Of the remarks of Judge Scott, in the course of his opinion in the case of *Carter* v. *Reddish*, 32 Ohio St. 1, in which he states what the court would have done upon a certain supposed case, it is only necessary to say that it was language in the nature of *obiter dictum;* it decides nothing, and we are at liberty to conclude that if the learned judge had given more than a passing thought to the supposed case, and had examined the law upon it, he would have omitted this unnecessary remark from the opinion.

It is urged on behalf of the construction for which the plaintiff contends that the qualified power of disposition given, found in the language of the will; *i. e.,* "Nothing in the foregoing will shall be construed as to deprive either of my sons disposing of their portion by will on their attaining the age of twenty-one years respectively," raises an implication that no more than a life estate in the sons was intended. It is said that if a fee simple was intended, then such power of disposition existed without these added words, for an incident of such an estate is a general power of disposition which would include this qualified or special power of disposition by will. But it is to be borne in mind that an unconditional fee simple was not given, but one subject to executory devises to take effect on certain contingencies whereby the fee simple would be cut down; and this power of disposition by will seems to have been given in view of that fact, and to enable the sons respectively to defeat these executory devises to the survivor and to enable the survivor to defeat the executory devises to brothers and sisters of the testator, in this special manner; for the sentence above quoted is followed by this, "The above limitation over shall give way to the pro-

visions of such will," clearly indicating the purpose of such power, a power that did not exist as an incident of such defeasible fee but only by virtue of this provision in the will. But otherwise, or as to all the world beside, a full power of disposition was vested in the sons as an incident of their estates, so that they might dispose of the same by deed or will, but all the while subject to the condition that if they conveyed the estate in their lifetimes, instead of at death by will, the estate conveyed would \be subject to the executory devises afore-mentioned.

I speak of this not because we are called upon to determine any interest that might have arisen in favor of those to whom the executory devises were limited, but simply because this clause or provision in the will has been looked to as an aid in its construction. There is no evidence or suggestion in the record of any such characteristics in the sons, or any such lack of confidence in them on the part of their father, the testator, as would naturally move him to seek to protect the unborn children against the action of their fathers, nor any reason why he should not have entrusted the full power of disposition as against such children to their fathers, trusting the fathers properly to conserve the interests of the children, and reward them according to their deserts. Thereby the fathers, if they had issue, might leave the whole property to them by will or by descent, or might make it over to them in their lifetime, or might, if he deemed them unworthy, cut them off or disinherit them, or might divide the same between such children and other natural objects of their bounty according to their deserts; and we hold that as against the lineal descendants, full power of disposition by any method of conveyance known to the law existed in the surviving son of the testator.

The provision as to cutting off the limitations over did not apply to such lineal descendants, because there was no limitation over to them; but it may be suggested that if their mention were to be deemed a limitation over to them, then the power to destroy such limitation by will was also given; and this is hardly consistent with the view that the testator regarded the possible descendants, no matter how far removed, with such deep solicitude that he designed to place his sons practically in the position of their tenants for life. It is urged too that a power to destroy an executory devise is inconsistent with a devise of a conditional or a defeasible fee to the one who may exercise such power, and that the consequences of conferring such power upon one to whom a conditional or defeasible fee has been devised is to raise it to an unconditional fee simple, and so, to destroy the executory devise;

Anderson v. Realty Co.

and it is urged that, since the testator must be presumed to have known this, and not to have contemplated, or intended such consequences, he must have intended a life estate instead of such defeasible fee. This is doubtless a fair argument, and yet the utmost consequence resulting from such grant of power that we have found reported in any of the authorities is that stated; *i. e.*, the destruction of the limitation over or the executory devise.

There is authority in support of the proposition that the giving of such power has the effect of destroying the executory devise, and it seems to find some support in the opinion of Judge Summers in the case of *Widows' Home* v. *Lippardt*, 70 Ohio St. 261 [71 N. E. Rep. 770]; but the point was not necessarily involved there, since the remainder was cut off by the exercise of the power; and we may doubt if the rule that the grant of a qualified power of disposition to the devisee of a defeasible fee serves to destroy the limitation over, will ever be adopted as the law of Ohio. There seems to us to be but little, if any, reason to support such a technical rule, while there is much to be said against it, perhaps the chief objection being, that it must in many instances defeat the intent of the testator. At all events we are not willing to say that it is so far in force and so potent in this case as to compel the conclusion that a life estate instead of a defeasible fee was devised to the sons.

I feel that this opinion, though extended to an unusual length, does not do full justice to the subject, nor to the full and learned briefs and arguments of counsel. Many questions discussed by counsel have not been touched upon, and we have not undertaken to compare and analyze the authorities; but have confined ourselves to somewhat general statements of conclusions. We have undertaken, however, to examine the record and the authorities, and to consider the arguments of counsel, with the greatest care, and we have devoted to the case our best efforts, because of the great pecuniary interests involved, and especially because we have found ourselves unable to reach the same results as were arrived at by another court for which we have the most profound respect. I refer, of course, to the federal circuit court of appeals of this circuit, and its decision in the case of *Anderson* v. *Messenger, supra,* involving the same transaction and title, and based upon substantially the same evidence.

The fourth point stated in support of the decision of the court below; *i. e.*, that Henry Anderson held the title in trust for Butler, and

Lucas County.

only to secure the Butler note, was involved in and discussed with the second question herein discussed.

In conclusion we express the conviction, borne in upon us by the whole record, that in the devises to his sons and others, Henry Anderson never had in mind or contemplated this specific property, but, on the other hand, he looked to Butler as a creditor for the payment of the whole $20,000 and interest, and expected his estate to be augmented and his devisees to be correspondingly benefited by such payment, and that this was understood by his representatives and the objects of his bounty and that such payment was in fact made to them and accepted by them, so that they received all they hoped for and all that they were entitled to receive; and that the deeds made in confirmation and ratification of those transactions, and the judgment of the court below, have accomplished the ends of justice and equity; and we feel a profound satisfaction in the conviction that no technical rules of construction of the will to determine doubtful meanings are needed to confirm this result.

The judgment of the court below is affirmed.